First matter listed for oral argument is Sunrise Pharmaceutical Inc. versus Vision Pharma and Sandra Buxman, counsel. Del Pizzo, may it please the court. My name is Nancy Del Pizzo. I'm with Rivkin Radler, LLP. I'm here with my colleague, Joshua Sybil, who has helped on the briefs. I represent the appellant, Sunrise Pharmaceutical Inc., and I respectfully ask for five minutes for rebuttal. Your Honors, this court can reverse on two bases. First, the U.S. Supreme Court has told us that speech contained within a petition is subject to the same standards for defamation as speech outside a petition. Thus, nor Pennington, or the petition clause generally, does not immunize false and defamatory statements. And even if it did, under this court's own jurisprudence, nor Pennington doctrine does not immunize statements made in a press release about a lawsuit, but not incidental to that lawsuit. Let me ask you at the start here, because we are hearing an appeal from a motion to dismiss. While some of your claims sound in defamation, are they actual defamation claims? I know that you have, what, six claims? And we've got several Lanham Act claims, count one and count three, I guess, state law claims. So, what is your answer to that? Have you pled a defamation claim, or are these claims rather based on provisions of law that essentially sound in defamation or involve elements that are close to those which are part of a defamation cause of action? Your Honor, I would answer that by saying that those claims sound in defamation. So, the unfair competition claims under the Lanham Act and under state law are based on the false and misleading statements in this press release. The Lanham Act claim for unfair competition is based on that. The Lanham Act claim for false advertising is based on, of course... We're not appealing the Antitrust Council. Understood, but there are six claims remaining for purposes of appeal, is that right? Yes. If you are correct, then, it's not necessary for you, is it, to satisfy us that the elements of a defamation claim have been met as a gateway issue here? Well, I think I would frame it this way. The lower court dismissed all of the claims based on an unreported case that held that claims sounding in defamation are immunized under Norah Pennington, and also based on the court's decision that the underlying litigation was not a sham. All of the claims remaining, since they sound in defamation, could not be, under our argument anyway, dismissed on the basis that Norah Pennington immunizes defamation, because the Supreme Court has instructed us that in every case where the Supreme Court has had the opportunity actually to look at whether a petitioning claim could immunize defamation, has instructed us that the right to petition is guaranteed, but the right to commit libel with impunity is not. What about the fact that under state law, at least two of those claims, tortious interference and trade libel, have an element of malice required? Okay, so let's litigate those. Our position is not that they should be dismissed on the basis of the Norah Pennington doctrine. How would that apply to those claims? Let the appellees... I understand, but to the extent that you're saying that they sound in defamation, there are circumstances where a defamation claim would require that that be pled as well. Here, a couple of those state tort claims have that same requirement. Do you contend that you have pleaded that to the extent that, whether viewed as a sounding in defamation that requires the pleading of actual malice? Yes, and I'll make two points on that. The lower court didn't address the elements of our claims first, and I know that the appellees remark about that in their brief, but the lower court didn't address them at all. In fact, she dismissed solely on the basis of Norah Pennington. If we're going to argue whether the elements of our claims meet the Rule 12b6 standard, I would say yes, and that for tortious interference, there is a malice requirement, and that is whether the speaker knew or was in reckless disregard for the truth. We did claim that, and we also pled special damages, which is also a requirement of a trade libel claim. We pled that Mr. Bussman and Vision knew that what they were stating in that lawsuit, for instance, that we defectively manufactured products and sold them purposely adulterated products, that he knew that that was false. He also knew that... Well, they claimed in the press release that we actually committed... That wasn't my question. I mean, I'm trying to get to really what's at the nature and what's at the heart of your claims, whether there is anything actually that is in the nature of or amounts to defamation, which I generally think of as involving damage to reputation. And I'm not seeing, at least on the face of this so far, something that is inherently reputational. Well, the trade libel claim itself is certainly reputational, and so is the Lanham Act claim. We've pled in the amended complaint that the result of these false and defamatory statements caused great harm to our client. In fact... I'm not suggesting that there's something defective about your Lanham Act claim, but I'm trying to separate out, if I can, from what are the elements, if you will, of the statutory violations alleged, as well as the state law claims that are alleged, from what is defamation. What is the definition of defamation? Maybe that's not possible. Maybe there's so much overlap here that they're one and the same thing. I think that's probably closer to what our point is, that they sound in defamation. Clearly, the elements of a Lanham Act claim are not identical to the elements of a trade libel claim. But they all sound in defamation, and the lower court dismissed on the basis that Noor Pennington can immunize claims of defamation. All of those claims. So what language in the press release was false, misleading, or defamatory? Well, first, that our clients committed... Can you quote it? Because I have the same question as the Chief. I think we need to look exactly at the language. And then I'm going to ask you not only to quote the language from the press release, but quote from your complaint, where it was pleaded properly. Okay. So in the press release, which is titled, Sunrise Pharmaceuticals Sued for Violation of the New Jersey Consumer Fraud Act, it starts out talking about the nine-count lawsuit, seeks to recover... I'm not asking you to summarize it. We have it right in front of us. Please tell us exactly what statement in there is false and defamatory. The nine-count lawsuit seeks to recover at least $3 million from Sunrise Pharmaceuticals, plus statute-imposed mandatory trouble damages and attorney's fees, pursuing to New Jersey statute, annotated 56-8-19. So what's false about that? Well, nor could we. But it says the nine-count lawsuit seeks to recover. You're saying that's false? The nine-count lawsuit doesn't seek to recover at least $3 million from Sunrise? No, I'm not saying that. Okay, then, again, please tell us what is false in here. We've asked the question a few times, and you're reading things that now you're telling us aren't false. So please tell us what is false in here. This is your burden at this point, to identify facially from both the press release and the complaint, side by side. What's false? What are the allegations of falsity? It's true that they filed a lawsuit, right? It's true that they filed a lawsuit alleging nine counts. It's false that we violated the Consumer Fraud Act, the New Jersey Consumer Fraud Act. It's false that we manufactured certain drugs. I'm sorry, where does it say you violated the Consumer Fraud Act? The express statement, they violated the New Jersey Consumer Fraud Act, isn't in here. But you can read that from this press release, right? You want us to infer the defamation. It's not here explicitly. It's to be inferred? No, I think it is here explicitly. I'm trying to give you a chance to quote it, tell us what it is. In the statement, which is quoted here from Sandra Bussman, it is very unfortunate that we had to file suit against Sunrise Pharmaceutical after numerous attempts to resolve these issues. These issues are stated above that, violation of Consumer Fraud Act, selling adulterated and defective manufacture of certain drug products. And then he said, however, the severe damages they caused to our company left us as the only option. We're certainly prepared for a trial by jury in taking this case to the end for a well-deserved victory. That victory, he's stating, is to recover at least three million dollars from Sunrise for violation of the Consumer Fraud Act. I hear, Your Honor, saying, does it need to be more than just we filed a lawsuit? Does it need to also say... Of course it does. We all know that. Filing a lawsuit is protected. But what I'm not understanding is why you are not focusing specifically, for example, is it your contention that the characterization or the deeming of certain drug products as adulterated and unsaleable is false or misleading or defamatory? Yes, we are. Okay, then let's turn to the complaint. Where is it pleading in the complaint? In the amended complaint on paragraph 44, for instance. In that press release, Vision Florida falsely states that Sunrise defectively manufactured certain drug products deemed adulterated and unsaleable by the U.S. Food and Drug Administration. In that press release, Vision Florida falsely states that Sunrise willfully sold adulterated drugs to Vision Pharma. Also in that press release, Mr. Busman, who is listed as the founder, president and CEO of Vision Pharma, also defames Sunrise as he's quoted as stating that the false and defamatory statements resulted in severe damage to Vision Florida and that the company filed a lawsuit based on those false and defamatory statements, quote, for a well-deserved victory. This press release is not incidental to the underlying lawsuit. That gets us into a question that I'm not sure we're prepared to address yet, which is North Pennington-related. Should we transition to North Pennington? One question. New Jersey recognizes a fair reporting privilege, separate and apart from statements that are made in the course of litigation, that covers reports about the company. Why wouldn't that cover these reports of what was alleged in the complaint that was filed? First, I believe, Your Honor, that the reporting privilege applies to the press. And even in that instance, a malice standard could apply as well. And also this is a press release. It's not an article, and it's drafted and issued by a private company. I'm sorry, the fair reporting privilege doesn't apply to the press? No, no, it does apply to the press. It doesn't apply to a private company issuing a press release, which is what we have in this instance. What's your authority for that? It's not in our briefs, Your Honor, and I would have to brief that issue, and I would be happy to get back to you. It's pretty common, putting aside the state, the New Jersey statutory question. Not only is there nothing untoward about the filing, or rather the release of a press release in connection with the filing of litigation like this, it happens in the ordinary course, doesn't it? It happens all the time. It does happen all the time, and I apologize again for not having the case to cite to you, but there is a case holding that when attorneys do it, they are under the malice standard, right? But not when a private party issues the press release. And maybe some of these attorneys could be sued, right? Maybe they're just not being sued. But that's not why we should now decide that Norr Pennington immunizes defamatory conduct, or that a press release that's not incidental to a lawsuit is immunized. Well, let's stop right there. You've introduced the subject of what is incidental. As I'm sure you know, this Court has very little Norr Pennington jurisprudence of its own. Beyond that, I'm not aware of a holding that declares a press release of this nature in this setting as incidental. Maybe there's something I've missed. But that said, tell us what the scope of incidental is. What is incidental to legitimate petitioning activity? I think we can look to this Court's discourse in the A.D. Bedell case, right? Where the Court found settlement negotiations between the tobacco manufacturers and sovereign states was incidental to the underlying lawsuit. Isn't that a pretty easy one? Settlement negotiations that relate to the suit itself? Well, there are a few cases that discuss whether settlement negotiations and they're up on appeal. So is another case. But in both of those, both courts, the Third Circuit and the Ninth Circuit, also referred to the sham litigation. Settlement negotiations are naturally intertwined with the progress or termination of the suit itself, right? And they involve typically the parties in the lawsuit. So with the exception of, I think... And counsel. And counsel. I think there was one case in this circuit, which is not in our briefs, it's a Lipitor case, which I think Your Honor was on, where that settlement agreement was not held to be immune because it was a reverse settlement agreement in the patent Hatch-Waxman cases. So sometimes... Beyond giving us examples, can you articulate what is the standard? Where is the line crossed? I ask about scope. Yeah, I can. And I think it's crossed. And I think we can look at the cases that have found incidental communication and those that haven't. And some of them were cited by appellees. And in those cases that found, that's the Kemmen Foods case, the OG International, Air Capital, ABC International, there was a theme in those cases. They were all intellectual property cases. And in there, the courts found that the plaintiffs who had sued for patent infringement, trademark infringement, copyright infringement, when they went outside extrajudicial communications, they were warning potential third parties who could also be sued for direct or contributory infringement. That's the difference there. That's why those courts found that it was incidental. Because just like pre-litigation letters, cease and desist letters, the third parties who are on the other end of the communications could be sued. Contrast that to the cases we've cited where the court said no incidental, not incidental to the lawsuit. And those include the Nuance case in the District of Delaware, Arista from California, and Riverbed. In those cases, they all talked about, in one instance it was a party who took the complaint and gave it to the press. Another instance it was a party who, just like here, merely relayed the status of the litigation, again, in the press to third parties that were not related. And those courts held that that has little relevance to the party's ability to prosecute its claim. So the cases that do find incident to are all looking at same parties, in furtherance of the claim, or in furtherance of prosecution of the litigation. And that just doesn't happen when it's just a press release to the public. All right, Ms. DiPietro, of course, we pretty much always do this. Red light's been on for a while, and you've reserved five minutes. We'll have you back. Mr. Gabethuller, am I pronouncing that correctly? Correct me, please. That's correct. I've stumbled into one, finally. Thank you. Your Honors, Henry Gabethuller, on behalf of the appellee's division, Farm and LLC, and Sandra Busman. Before I address some of the legal issues raised by the appellant, I think it's important to emphasize that the court's decision below was not simply on the law, but also found appellant's pleadings deficient. The dismissal opinion indicates that the court thoroughly considered the complaint and its allegations, found that the division action, which is the 2013 action, that's the subject of the press release, is not a sham litigation, and appellant's allegations to that issue conclusory. Let's look at the press release side by side with the FDA letter. The press release does not just parent the FDA letter, does it? It characterizes in a manner or manners that the FDA does not resort to in its letter. Would you agree? If I recall correctly, the FDA letter does expressly deem the appellant's products adulterated for having been manufactured out of compliance with current good manufacturing practices. So while I would agree the press release does not copy verbatim, it is consistent with that, the FDA's finding. Can you defend a case, though, saying that it wasn't, the products weren't adulterated? No. There were assertions made in connection with another litigation that they were still safe. And adulterated means, in some instances, not manufactured in compliance. Did you say they were saleable, then, in that case? I do not recall offhand. The reason I ask is to the chief's point, his question is that it's one thing to say that the FDA has deemed these products adulterated and unsaleable. It's another thing for you to say they are. You see the distinction? Between you concluding it and stating your conclusion and merely quoting what the FDA has stated itself. Right. Material deference? I believe it's the statement regarding the FDA that's in the press release is really was that the FDA determined these products to be adulterated. And that Sunrise, with full knowledge of the FDA's investigations and determinations, willfully sold those products to our client. You indicated, rather your client did, that the pharmaceuticals were the result of defective manufacture. Isn't that the characterization that was used? Did the FDA use that? The FDA did not. I do not know for sure use the word defective, but the FDA talked about significant variations from what was required or significant violations of the current good manufacturing practices regulations. And I have never taken a volume of that to read before I went to bed. But I assume that they have some considerable significance here to the quality of drug product. Yes. And it's also reliability. So while the end drug product might be tested and end up being fine when your manufacturing practices are not consistent with the regulations. But the FDA did not say that the drugs were adulterated because there's no clear proof. All right. But you went beyond that again in the news release by saying that the drugs were unsaleable, right? Yes, they were. The FDA did not say the drugs were unsaleable. Am I right? Because the drugs were declared adulterated, the FDA prevented further sale of those drugs. And so, yes, they were unsaleable when deemed adulterated by the FDA. What about the issues of willfulness and the severity of damages? Neither of those appear in the FDA letter. Yes. And that comes up from the context. The FDA made numerous inspections and findings that there were problems with their manufacturing practices and notified the appellant. And when the appellant did not notify the appellee of that and continue to sell them products, that is where this assertion that it was fully sold, those products which were not manufactured in accordance and which were adulterated. That could also be reckless or negligent. I mean, we're at the motion to dismiss stage. So unless we have we're confident that there's with discovery, no, no possibility that these characterizations could be deemed false. Would it be appropriate for us to affirm a dismissal? Yes, it would. Now, these statements in the press release are a true characterization of the nature of the complaint. Well, the FDA, once again, if I recall, your news release stated that Sunrise had willfully sold adulterated drugs, did it not? To that effect, Your Honor, I don't have it right here in front of me and I can pull it out. Sunrise Pharmaceuticals willful sale of said adulterated drugs to Vision Pharma. Did the FDA letter state that what Sunrise had done was willful, that it was a willful sale of adulterated drugs? The FDA did not state willful, but when the FDA informed the appellant that its products were being adulterated or sorry, being manufactured, not in compliance. And with that knowledge, they continued to sell product to the appellee. For that reason, it is clear that this was a willful sale of those products to our two. Judge Krauss just made reference to the fact that we're at the motion to dismiss stage. The district court was here and that sometimes makes a difference, does to the district court or should and does to us eventually. And it may be of particular significance when Norr Pennington is being raised. Is Norr Pennington a form of immunity or is it an affirmative defense? It is a defense. And wouldn't it be more appropriately raised at summary judgment? It is. I characterize it as a defense, but it is, yes, often referred to as a Norr Pennington immunity. We have said it's an affirmative defense. Have we not? We have said that it's an affirmative defense. Have we not? At least once. We? I do not know for sure. But if I may, one final point. The pleadings on this issue of whether this press release was false and defamatory are conclusory in that regard. Just simply stating it was false and defamatory. Ms. DelPizzo quoted from the complaint, though, 44, 45, and 46, and those paragraphs really were just assertions that these statements are false and defamatory. Really, there is no... Are they supposed to prove it at the complaint stage? Well, they certainly need... That it is false or defamatory is a conclusion. And without facts to plausibly support that conclusion, it is insufficient. You raised an argument below that a privilege applied. Which privilege were you referring to? That was the litigation privilege, but also with reference to something akin to the reporting type immunity noted previously. Let's turn to the issue that we also inquired about when Ms. DelPizzo was at the court. And that is the incidental nature, it's well known, of this news release. And we did press to try to get some kind of statement of scope, if not definition. And I don't think we were very successful, but she'll be back on rebuttal. So maybe we can get some more guidance. Can you provide us with some guidance? Sure. How is this incidental? How would this be incidental? Okay, so first I would like to note that not once did the appellant argue that the press release was not incidental as a basis for disqualifying it from the protections of Nora Pennington before the court below. In relation to the motion to dismiss or the motion for reconsideration briefing. So that issue of waiver aside, this press release here really was incidental. How would the other side have raised this issue before the district court? If, for example, it is correct that Nora Pennington is an affirmative defense, and you would therefore be the party raising it as such. How did you raise Nora Pennington in the context of a motion to dismiss? Yes, so in the motion to dismiss the defense that Nora Pennington immunized this particular press release from the claims, defendant's response was simply that Nora Pennington did not apply because of the sham litigation exception. They did not raise the additional argument that this is not qualified for Nora Pennington immunity, or that for some reason it is not subject to protection under Nora Pennington. And so once that was invoked, Nora Pennington was invoked, it was the appellant's responsibility to counter that. Even if they had, this press release still would be considered incidental under the case law that the appellant has cited, and the more analogous case law that the appellee cites. Now there's no bright line. Isn't there a distinction in both the case law and also in treatises that discuss this between statements that are gratuitous, they're unnecessary, and their articulations of what's incidental or ancillary for Nora Pennington purposes, as articulated by both the Supreme Court and other courts, tend to include the word essential. I respectfully would disagree that essential is a necessary aspect of conduct in order to be In what way does a press release after the fact in litigation, not traditional petitioning of the government, further the petitioning act? That is, further some litigation? Sure. At a minimum, I'd submit that a press release provides a notice function in furtherance of that litigation. It ostensibly informs others who might be similarly damaged by the appellant's conduct. Let's spot you that. But even if that's the case, responding to Judge Krause's question, how does that constitute the kind of petitioning that we normally think of in connection with Nora Pennington? It could be notice to your shareholders, notice to the owners, so they are aware of what's going on in corporate work of this company. They have every right to know. You probably have, rather the management probably has an obligation. We're not in an SEC case here, and I don't know whether your shares are publicly traded, but there may be implications under various securities laws, whether they be federal or state. But nonetheless, I mean, that sounds like an objective that furthers the interest here of the company. But I'm having a hard time relating it to the lawsuit itself, except that it's about the lawsuit. It recites certain facts or allegations that are at issue in the lawsuit. As I mentioned, one example of how it could be in furtherance is that it may inform others who are similarly damaged by the appellant's conduct, might have similar claims, possibly valuable information to share. Isn't that publicity, not petitioning? They seem like two very different things to me. That is publicity that is incidental to the petitioning conduct, which is the underlying litigation. And so it is conduct in furtherance of the petitioning conduct. It is normally often commonly related to the petitioning conduct. It's about the petitioning conduct, but it's about the petitioning activity. But incidental here is a word of art we're struggling with in understanding at least its bounds. I acknowledge that there is no bright line rule here, and what we have are cases that provide somewhat of a situation sense. We've extended the concept of Noor Pennington to notice to potential defendants, but what authority is there for extending it to what you're now calling public notice rationale? Isn't that already sufficiently covered well outside of Noor Pennington by the requirement of actual malice if it's an issue of public interest or public concern? Well, one example just comes to mind offhand, and that was the Kemen case cited in, I believe, the appellee's brief. And that was a simple public notice about patent litigation and claims that a party was infringing another party's patents. And so that wasn't a direct or even a threat against any particular third party. It served a notice function. Other cases like the Fifth Circuit case in coastal states, there were indirect, well, there were statements of one's party's rights that were made to the press. And that was considered putting the market on notice of such rights or a notice of an informative nature. And this particular scenario here is not significantly different from that. The notice that it does provide, whether it's to other potential plaintiffs  in the same situation, that still could have value and could be in furtherance of the litigation and petitioning efforts there. All right. Thank you, Mr. Carroll. We've extended the time here, but we'll now turn to Ms. Alito for rebuttal. A couple things. I'm going to try to give you a better explanation for what I was trying to describe by the incidental to test. And I think Judge Krause really hit it on the head. Is it essential to the underlying litigation? There's a but-for test in those cases. It's not just notice. And that but-for test is will the publicity affect the underlying litigation? Is it in furtherance of? Will it aid in prosecution of? Simply notifying the public that you filed a lawsuit doesn't meet that test. And also, Kemen and Coastal were not just notification cases. In Kemen, it was a patent infringement case. There were potential third-party defendants that they were warning could be sued also. And in Coastal, it was a dispute over who owned the rights to oil. And in that, too, the court said, those were threats. You cannot buy from this individual. I am the only one who owns those rights. And I also want to say, this court did, and we incorporated, of course, find that the North Pennington Doctrine is a defense and not an immunity. And in that case... I would also like to say that the lower court didn't look at the factual deficiency of these elements, as Appelli appears to have just stated. The only element the court may have remarked on in terms of being deficient was when we alleged verbal defamation. And the court said, that's not enough to meet the pleading standard. The court just didn't look at any of the other elements. Counsel has suggested that you waived any argument other than the sham litigation. Can you point us to where in the record it reflects that you did raise in the district court an objection on incidental grounds? Two points on that. We cited the Hendricks case, which talks about whether extrajudicial communications are incidental to the litigation. What did you cite it as supporting or with reference to? We cited it as supporting or with reference to our argument that this extrajudicial press release is not immunized under North Pennington. I would also say that we haven't waived the argument. We raised the... If your honors are going to say we didn't use the specific words incidental to, I might concede that that's likely correct in the underlying briefs. But we raised the claim. And on appeal, if you raise the claim, you can certainly raise new arguments or new cases, which we have done here. That's not what we said in Joseph or Spiraeus. I think you wrote a landmark opinion in Joseph that in detailed fashion explains the difference between a claim and an argument, right? I'm at a little bit of a loss because I haven't briefed this issue and I just said it. So if your honors would like me to... Joseph was a criminal case, so you probably didn't come across it. But Spiraeus was a civil case that I'm familiar with, which basically tracked the reasoning of Joseph. So did you raise the argument? I believe we did raise the argument. It's in the Hendricks case. It's all over the Hendricks case. In fact, that case looked at all, I think, four or five different extrajudicial communications and went through each one. And this is incidental to, this is not incidental to. We gave that to the lower court. It did not sway her reasoning. You didn't hang your hat, though, on the incidental nature. I would concede we did not hang our hat on it. We were responding to a motion to dismiss that. Well, and stop right there because, I mean, does that help you? The fact that you are only at the motion to dismiss stage as opposed to summary judgment, where it is probably more appropriate, probably more helpful to be able to raise and decide the affirmative defense? I would agree with your honor that that is the case. We don't even, we don't agree that the underlying lawsuit is not a sham, but we didn't raise that on appeal, right? Nor did we agree that it should have been decided on a motion to dismiss, because there are factual issues that go to that, too. We raised the incidental to test because the lower court relied on one unreported decision with the Capital Health case, which we believe was also ruled on wrongly. And in that case, the court expressly stated that he did not have alternative authority to rule otherwise. And if you look at the underlying briefs, they solely focused on the New Jersey litigation privilege. We didn't do that. We provided additional cases. We provided cases that cited to Brownsville, this court, on the distinction between the right to petition and the right of free speech. All right. Your time is up, Mr. Pizzo. Thank you. Thank you.